UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                          *        CIVIL ACTION
SOUTHERN SCRAP MATERIAL CO., L.L.C.,
AS OWNER OF THE SOUTHERN SCRAP DRYDOCK     *        NO. 06-1860
IN A CAUSE OF EXONERATION FROM OR                  c/w 08-5026
LIMITATION OF LIABILITY
                                          This Order applies to 08-5026

                                          *        SECTION "F"

                        <u>ORDER AND REASONS</u>


     Before the Court are three motions by the United States: (1)

motion for summary judgment on liability; (2) motion to dismiss or

alternatively to sever and stay Southern Scrap's counterclaims; and

(3) motion for summary judgment and motion in limine regarding

actual wreck removal costs.   For the reasons that follow, the

motion for summary judgment on liability is GRANTED; the motion to

dismiss or alternatively sever and Stay Southern Scrap's

counterclaims is DENIED in part and GRANTED in part; and the motion

for summary judgment and motion in limine is GRANTED in part and

DENIED in part.

                            **Background**

     This case arises from the well-known breakaway and sinking of

Southern Scrap's drydock in the Industrial Canal during Hurricane

Katrina, and its subsequent removal by the United States Army Corps

of Engineers.

*The Drydock*

Southern Scrap owns a metal recycling facility in New Orleans, which is located at the junction of the Inner Harbor Navigational Channel (IHNC or Industrial Canal) and the Mississippi River-Gulf Outlet (MRGO).[1]  In July of 2005, Southern Scrap purchased a modular drydock section, intending to recycle it for scrap metal. Once it was towed from Mississippi to New Orleans, the drydock, which was 220 feet long by 157 feet wide by 24 feet deep and displaced 3,868 tons, was secured at the Vessel Recycling Facility with multiple soft mooring lines forward and aft secured to concrete deadmen embedded in the bank, as well as four heavy anchor chains secured to concrete piers built into the bank.  The anchor chains and mooring lines were secured initially to mooring bitts on the drydock, but as the mooring bitts were removed as part of the scrapping process, the lines were secured to and around steal beams within the drydock's structural framework.

*Hurricane Preparations*

Sometime after August 16, 2005, during the course of cutting the drydock into pieces for recycling, Southern Scrap had disconnected the mooring lines and turned the drydock around.  On Friday, August 26, 2005, with Hurricane Katrina in the Gulf of Mexico, Southern Scrap personnel began preparations for the storm.

---

[1]The Industrial Canal connects the Mississippi River, the Gulf Intracoastal Waterway, Lake Ponchartrain and the MRGO; it is a heavily used commercial waterway.

Grant Judy (Southern Scrap's supervisor of demolition) was instructed to reattach the four anchor chains to prepare the drydock for 6 to 10 feet of tides. Judy passed each of the four anchor chains through a hole cut into the drydock's watertight bulkhead, looped each chain around a structural beam within the drydock's framing, brought each chain back out through another hole cut into the drydock's bulkhead, and then shackled each chain to itself using a 100-ton shackle.[2]  On Saturday, August 27, the National Hurricane Center classified Hurricane Katrina as a Category 3 hurricane, which would strengthen over the next 24 hours and directly strike New Orleans.  That same day, the Orleans Parish Levee District notified Southern Scrap that it was preparing to close the S1 floodgate late that day, which would block road access into and out of Southern Scrap's facility.  Southern Scrap had many tasks to complete in a limited amount of time, with limited personnel (all of whom had to evacuate) in advance of the storm. Southern Scrap employees had evacuated the facility by 6:00 p.m.

*Hurricane Katrina*

On Monday, August 29, 2005, Hurricane Katrina made landfall in southeast Louisiana as a Category 3 hurricane with sustained winds

---

[2]Although it was not their pre-Katrina practice, Southern Scrap now sinks vessels and unseaworthy barges to the bottom of the Industrial Canal and cuts holes in them to prevent them from refloating as storm surge rises.  This in compliance with Captain of the Port orders issued after Hurricane Gustav in September 2008. These measures were not required before Katrina, nor did Southern Scrap believe such measures were necessary at the time.

of 127 miles per hour. Katrina produced a storm surge up to 17

feet on Southern Scrap's property at the junction of the Industrial

Canal and MRGO;[3] at some point during the storm, the partially

scrapped drydock broke free from its moorings,[4] crossed the

Industrial Canal, and partially sank against the northwest fender

of the Florida Avenue Bridge.[5] Along with many other obstructions

in the waterways,[6] the government considered the sunken drydock,

which was allegedly struck by two different commercial tows,[7] a

_____

[3]That was at least 9 feet higher than the previous high water mark at the Southern Scrap facility from Hurricane Betsy in 1965.

[4]The four anchor chains and shackles securing the drydock held, but the structural members of the drydock to which they were secured did not.

[5]No eyewitnesses to the breakaway have been located, and there is no evidence to establish when the drydock broke free.

[6]Numerous barges and other vessels in Southeast Louisiana escaped their moorings and were stranded. In the Industrial Canal, two barges were on top of the Almonaster Bridge; another barge was on top of Southern Scrap's drydock and the northwest fender of the Florida Avenue Bridge; two barges were on Southern Scrap's dock; another barge was in the Lower Ninth Ward; and a functional drydock and crane barge from the Bollinger Shipyard were on Southern Scrap's property, approximately 300 to 400 yards inland of the canal.

[7]American Commercial Barge Lines and Maryland Marine are two of the claimants that filed claims in Southern Scrap's limitation proceeding. Claimant American ACBL alleges that the M/V WENDY C was towing a barge through the Industrial Canal on October 16, 2005 when the barge struck the drydock, causing damage to the barge and its cargo. Similarly, claimant Maryland Marine alleges that the M/V BETHESDA had a tank barge in tow on the Industrial Canal on November 9, 2005 when the barge struck the drydock, resulting in damage to the barge.

hazard to navigation and determined that it had to be removed immediately, on an emergency basis.[8]

*Drydock Removal*

On September 3, 2005, the Corps hired Boh Bros. to clear all obstructions from Southwest Pass and the Industrial Canal, including the Southern Scrap drydock, for a fixed price not to exceed $500,000. Several days later, the Corps contacted Southern Scrap's president, Joel Dupre, and asked him to remove the drydock (which, at the time, still had a barge on top of it). Dupre told the Corps that Southern Scrap could not do so because it did not have access to its drydock given the complete lockdown of New Orleans.

In mid-September 2005 the U.S. Army Corps of Engineers undertook to remove the drydock: Boh Bros. Construction Co. and its subcontractor, Bisso Marine, began salvaging the drydock. Two and a half months later, removal was completed on December 2, 2005.[9]

---

[8]After the storm, the Corps conducted surveys of the navigable waterways and determined that the drydock blocked approximately 2/3rds of the channel, reducing the width of the channel from 300 feet to approximately 110 feet. The severity of the obstruction threatened marine transportation of equipment and materials between the Mississippi River and Lake Ponchartrain in support of disaster response and recovery operations, and the movement of commercial navigation along the Gulf Intracoastal Waterway.

[9]The Corps confirmed its September 3 letter agreement by issuing a Standard Form 1442 contract on October 5, 2005; the contract reiterated that Boh Bros. would remove all obstructions from Southwest Pass and the Industrial Canal for a total firm-fixed price of $500,000. On October 15, 2005 the Corps agreed to a

Boh Bros. invoiced, and the Corps paid, more than $12 million for the removal of the obstructions from Southwest Pass and the Industrial Canal; the Corps contends that $9.3 million of that total is attributed to the removal of the Southern Scrap drydock. The Corps sent a demand letter to Southern Scrap, seeking reimbursement for wreck removal costs pursuant to 33 U.S.C. § 409. Southern Scrap refused to pay, and this litigation ensued.

*Procedural History*

On April 11, 2006, Southern Scrap filed a limitation proceeding, seeking to limit its liability, pursuant to the Limitation of Liability Act, 46 U.S.C. § 30305, to the post-casualty value of the drydock.[10]  In accordance with the Limitation of Liability Act, the Court entered an order enjoining the commencement or prosecution of all claims against Southern Scrap based on the drydock breakaway, and set a deadline for filing

---

modification of the contract, increasing the price to a fixed price not to exceed $3.6 million; the contract stated "[t]he increase is necessary due to the unforeseen difficulty of the removal of the obstructions at Inner Harbor Navigational Canal."
        The Corps maintains that the project proved to be more difficult, time-consuming and costly than initially envisioned by the Corps because the project commenced so soon after Katrina had hit New Orleans.  Some of the challenges included procuring equipment, supplies, and services, finding manpower, and arranging transportation to and from the job-site, as well as the fact that Hurricane Rita struck Lake Charles on September 23, significantly impacting New Orleans.

    [10] Southern Scrap alleges that the drydock was a vessel, that Southern Scrap was not responsible for the breakaway because it had not acted negligently, and that it anticipated that claims would exceed the post-accident value of the drydock ($316,131.64).

claims in the limitation proceeding.  The United States, and four others, filed claims.

In December 2006, the United States requested that the Court lift its injunction so that it could pursue a separate Wreck Act claim against Souther Scrap.  In April 2007 the Court granted the United States' request.  <u>In re Southern Scrap Material Co., L.L.C.</u>, No. 06-1860, 2007 WL 1234995 (E.D. La. Apr. 26, 2007).  Southern Scrap appealed.  On August 25, 2008 the Fifth Circuit affirmed the Court's ruling, expressly holding that the United States' Wreck Act claim was not subject to the Limitation Act.  <u>In re Southern Scrap Material Co., LLC</u>, 541 F.3d 584, 595 (5th Cir. 2008).  The Fifth Circuit further held that the Wreck Act afforded the government the right to recover its actual costs of removing the sunken drydock, without alleging that Southern Scrap negligently caused its sinking.  <u>Id.</u> at 592.  Southern Scrap appealed the ruling to the Supreme Court, which denied certiorari on March 30, 2009.  <u>Southern Scrap Material Co., LLC v. U.S.</u>,  129 S.Ct. 1669 (2009).

Two years after Katrina, on August 29, 2007 Southern Scrap asserted a counterclaim against the United States, alleging that the United States, through the Corps, had negligently designed, constructed, inspected, repaired and maintained the MRGO, resulting in an increase of Hurricane Katrina's storm surge.  Southern Scrap asserts that the storm surge inundated its facilities and caused the drydock to break away.  In its answer, the United States raises

several defenses challenging the existence of this Court's subject matter jurisdiction over Southern Scrap's counterclaim.

On November 28, 2008 the United States filed its Wreck Act complaint against Southern Scrap, asserting that it is entitled to seek recovery for the costs of removing Southern Scrap's drydock from the Industrial Canal. On December 23 the case was transferred to this Court, and it was consolidated with Southern Scrap's limitation proceeding, at the request of the parties.

On February 23, 2009 Southern Scrap answered the United States' complaint, and filed a counterclaim. In its answer, Southern Scrap raised 12 defenses, including that the drydock breakaway was caused by an Act of God and that the breakaway was solely due to the negligence of the United States in its design, engineering, construction, repair, and maintenance of the MRGO. Southern Scrap also challenges the reasonableness of the wreck removal costs, and asserts that the United States should have accomplished removal of the drydock pursuant to the Stafford Act, 42 U.S.C. § 1521. Southern Scrap admits that the drydock was in navigable waters, but denies that the wreck created a hazard or obstruction. Southern Scrap pled the right to limit its liability and alleged that it did not negligently cause or allow the drydock to break away.

*MRGO Litigation*

Meanwhile, as this litigation was proceeding in this Court,

the case captioned <u>In Re Katrina Canal Breaches Consolidated</u>
<u>Litigation (Robinson)</u>, Civil Action No. 05-4182, was proceeding
before Judge Duval.  In that case, the plaintiffs sought monetary
awards based on damages sustained during Hurricane Katrina,
allegedly as a result of the existence of the MRGO.[11]  On November
18, 2009, following a 19-day bench trial, Judge Duval ruled in
favor of most of the plaintiffs.  <u>Robinson</u>, 647 F. Supp. 2d 644
(E.D. La. 2009).  The court found that the Corps' negligent failure
to properly maintain and operate the MRGO was a substantial cause
for the breaching of the Reach 2 Levee and the subsequent flooding
of the St. Bernard Polder.[12]  The court specifically held that the
Corps waived sovereign immunity with respect to the maintenance and
operation of the MRGO.  <u>Id.</u> at 699.  As to the New Orleans East
Polder, the court found that the Corps did not have a duty to
construct a surge protection barrier and that any funneling of
storm surge waters, resulting in an increase in volume of surge and

---

[11]Specifically, the plaintiffs in the St. Bernard Polder
alleged that the operation and maintenance of the MRGO caused the
levee along "Reach 2" to be breached, resulting in flooding of
Chalmette and the Lower Ninth Ward.  In re Katrina Canal Breaches
Consolidated Litigation (Robinson), 647 F. Supp. 2d 644, 679 (E.D.
La. 2009).  The plaintiffs in the New Orleans Polder alleged that
the MRGO caused a greater conveyance of storm surge water, which
caused the levees protecting the New Orleans East Polder to be
overtopped or breached.  They claimed that the Corps should have
constructed a surge protection barrier that would have prevented
flooding in New Orleans East.

[12]A "polder" is a track of low land reclaimed from a body
of water.

velocity, was inherent in the original design of the MRGO. _Id._ The court concluded that a substantial portion of the harm would have arisen from the original design of the MRGO, and that claims based on breaching or overtopping in the New Orleans East Polder were not necessarily free of Flood Control Act immunity issues. _Id._

In considering the government's defenses, the _Robinson_ court restated its earlier decision denying applicability of the Flood Control Act, and ruled that the due care exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), did not apply. _Id._ Regarding the discretionary function exception, the court held that the Corps was immune from damages arising from the design and construction of the MRGO, but that the exception did not apply to the Corps' maintenance of the channel. _Id._ The court awarded damages to all plaintiffs except Norman and Monica Robinson, whose home is located in the New Orleans East Polder. _Id._ Denial of the Robinson's claim for damages was based on the court's earlier conclusion that it was not negligent for the Corps to refrain from constructing a surge protection barrier, and its conclusion that funneling of the hurricane surge was inherent in the design of the MRGO.

Following that ruling, the United States and the plaintiffs requested a new trial, but the court denied the motions. On March 25, 2010 the parties noticed their appeals to the Fifth Circuit

U.S. Court of Appeals.  That crucial appeal is presently pending.

*The Pending Motions*

In this case, the United States now seeks the following relief: (1) summary judgment on liability for wreck removal expenses; (2) dismissal of Southern Scrap's counterclaims, or to sever and stay those claims because of the Robinson appeal; and (3) a ruling that the government may recover all of its actual wreck removal costs, subject to proof at trial and a ruling barring Southern Scrap from introducing evidence or testimony regarding the reasonableness of the costs of removing the drydock.

## I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely

colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

## II.
### A.

The purpose of the Rivers and Harbors Act is "to prevent obstructions in the Nation's waterways." Wyandotte Transp. Co. v. United States, 389 U.S. 191, 201, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The coverage of the Rivers and Harbors Act is broad, and its principal beneficiary is the United States government. Id. The Wreck Act, which is part of the Rivers and Harbors Act and includes 33 U.S.C. §§ 409, 411, 412, 414 and 415, empowers the United States to remove wrecks from its navigable waters in order

12

to "protect[] other vessels plying the same waters" as the sunken vessels.  United States v. Raven, 500 F.2d 728, 732 (5th Cir. 1974).

Section 409 of title 33 of the United States Code,[13] which addresses navigable waterway obstructions, is structured by three separate operative clauses.  In re Southern Scrap Material Co., LLC, 541 F.3d 584, 595 (5th Cir. 2008), cert. denied, 129 S.Ct. 1669 (2009).  As the Fifth Circuit observed:

---

[13]This provision is referred to as "section 15" of the Rivers and Harbors Act.  See, e.g., Wyandotte Transp. Co. v. United States, 389 U.S. 191, 196-97 (1967); University of Texas Medical Branch at Galveston v. United States, 557 F.2d 438, 441 n.1 (5th Cir. 1977) ("Sections 15, 16, 19 and 20 are collectively known as the Wreck Act").
    Section 409 provides:

> It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to sink, or permit or cause to be sunk, vessels or other craft in navigable channels....  And, whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, it shall be the duty of the owner, lessee, or operator of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said, owner, lessee, or operator so to do shall be unlawful; and it shall be the duty of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418 and 502 of this title.

The first clause prohibits the sinking, or permitting or causing the sinking, of vessels or other craft in navigable channels. The second clause provides that the owner, lessee, or operator of a vessel sunken in a navigable channel must mark it with a buoy or beacon by day and a light at night. The third clause provides that the owner, lessee or operator of a vessel sunken in a navigable channel shall commence the immediate removal of the vessel and prosecute the removal diligently, or else be considered as having abandoned the vessel, subjecting it to removal by the United States as provided for in 33 U.S.C. §§ 414 and 415.

Id. at 588. The 1986 amendments to the Wreck Act, which removed the phrase "voluntarily or carelessly" from the first clause of Section 409, the Fifth Circuit has also observed, "expand[ed] the potential for vessel owners' liability without fault for governmental wreck removal costs." Id. at 591; see also In re Barnacle Marine, 233 F.3d 865, 868 n.6 (5th Cir. 2000)("In 1986, nineteen years after Wyandotte, Congress changed § 409's standard for liability from negligence to strict liability."). "[T]he new §§ 414(b) and 414(c) now permit the United States to hold a non-negligent vessel owner personally liable for the total amount of governmental wreck removal costs when it fails to remove its sunken vessel as required by the third clause of § 409." Southern Scrap, 541 F.3d at 594.

Accordingly, the Fifth Circuit, in affirming this Court's ruling, underscored that "the United States can state a personal liability claim against Southern Scrap under the Wreck Act for the recovery of its actual cost of removing the drydock from the Industrial Canal without alleging that the vessel owner negligently

caused the sinking." <u>Southern Scrap</u>, 541 F.3d at 592.[14]

Further, in holding that the Limitation Act does not apply to limit the United States' recovery of wreck removal costs under the Wreck Act, the Fifth Circuit repeated that "the new §§ 414(b) and 415(c) now permit the United States to hold a non-negligent vessel owner personally liable for the total amount of governmental wreck removal costs when it fails to remove its sunken vessel as required by the third clause of § 409." <u>Id.</u> at 594.

Sections 414 and 415 authorize the United States to remove vessels sunken in navigable waterways and to recover removal costs when the responsible party fails to prosecute immediate removal diligently as required by the third clause of Section 409. Section 415(a) authorizes the government through the Secretary of the Army, in an emergency, to take immediate possession of a sunken subject that endangers navigation in any navigable waterway of the United States, and to remove or destroy the sunken subject to eliminate the obstruction.

---

[14]Thus, as the Fifth Circuit instructed when this matter was first on appeal, the essential elements of the government's Wreck Act claim under § 409 are: (1) that Southern Scrap's vessel was wrecked and sunk in a navigable channel; (2) that it was Southern Scrap's duty as its owner to commence the immediate removal of the same; (3) that Southern Scrap failed to do so and thereby abandoned the drydock and subjected it to removal by the United States as provided for in §§ 414 and 415 of the Wreck Act; (4) that the government removed the sunken drydock from the navigable channel in accordance with these statutory provisions; and (5) that Southern Scrap as owner and operator of the sunken drydock is liable to the United States for the cost or removal of that vessel. <u>Id.</u> at 591.

Section 415(c) provides that the owner, lessee, or operator of a sunken vessel shall be liable to the government for the costs of removal on an emergency basis under § 415(a), except that in such case, the removal costs also shall include administrative expenses.[15]

*B.*

The United States contends that it has stated a claim under the Wreck Act, given that there is no dispute that Southern Scrap was the sole owner of the drydock; no dispute that the drydock broke free of its moorings and sank in the Industrial Canal (a navigable waterway); that the drydock was a hazard to navigation, which had to be removed; that the Corps contacted Southern Scrap and asked it to remove its drydock from the Industrial Canal; that Southern Scrap responded it would not be able to immediately remove the drydock; that the Corps hired Boh Bros. to remove the wreck, which took three months and cost the Corps in excess of $9 million; and that Southern Scrap has refused to pay. Southern Scrap does not contest that the Wreck Act imposes liability without fault or that the government has not stated a claim under the Wreck Act. However, Southern Scrap raises various defenses to the United States' claim. The parties dispute whether Southern Scrap may

---

[15]In 1996 Congress amended § 415(b) by re-designating it as § 415(c), and by striking "cost" and inserting "actual cost, including administrative costs." See Water Resources Development Act of 1996, S. 640, 104th Cong. § 218(b)(1996). Neither side disputes that the breakaway drydock is a vessel under the Act.

raise defenses based on Act of God, government fault, or the Stafford Act.

1.    Act of God

Southern Scrap insists that it has a right to raise Act of God as a defense to the government's statutory wreck removal claim. Southern Scrap seeks refuge from the statutorily imposed strict liability by suggesting that, while the Wreck Act itself does not require a showing of fault, there must still be some element of causation, some causal contribution from the wreck owner.[16] Southern Scrap says that, when Act of God applies, there is a lack of causation.[17]    This argument seems to confuse elements of causation with elements of accountability.  Strict liability theory is anchored to being held accountable, even absent bad conduct. The United States counters that Southern Scrap's argument would essentially require that the wreck owner must have negligently

---

[16]Southern Scrap points to the first part of Section 409, which makes it unlawful "to sink, or permit or cause to be sunk, vessels or other craft in navigable channels."  Why this language supports Southern Scrap's position is unclear.

[17]Southern Scrap points out that the Eleventh Circuit has observed that "[t]he act of God defense denies that the defendant's acts or omissions, even assuming they did not meet the standard of reasonable care under the circumstances, caused the accident." Fischer v. S/Y NERAIDA, 508 F.3d 586 (11th Cir. 2007).  Rather, "[s]uch accidents are 'inevitable' or 'unavoidable' in the sense of being overdetermined."  Id.  ("In other words, the accident would have happened anyway regardless of what the defendant did."). Southern Scrap insists that, when Act of God applies, it "sensibly requires a showing that all reasonable measures would have been futile."  Id.

caused the presence of the wreck in navigable waters, which is contrary to the strict liability imposed by the Wreck Act.

Without burdening this decision with an overdose of theory, Hurricane Katrina may well be considered to have been an Act of God. _See_, _e.g._, <u>John W. Stone Oil Distributor, L.L.C. v. Bollinger Shipyards, Inc.</u>, No. 06-2377, 2007 WL 2710809, at *6 (E.D. La. Sept. 12, 2007); <u>In re Marine Leasing Servs.</u>, 471 F.2d 255, 257 (5th Cir. 1973)(_per curiam_)(burden of proving that Hurricane Betsy was an Act of God which human skill and precaution could not have prevented was on defendants). One invoking Act of God as a defense must prove not only that the weather was heavy but also that it "took reasonable precautions under the circumstances as known or reasonably to be anticipated." <u>In re United States (Dammers & Van der Heide Shipping & Trading (Antilles), Inc. v. Steamship Joseph Lykes</u>, 425 F.2d 991 (5th Cir. 1970).

Southern Scrap points out that the Wreck Act does not expressly preclude an Act of God defense. But the Wreck Act does not expressly include an Act of God defense either. Indeed, unlike the Wreck Act, several maritime statutes do include Act of God as an available defense. _See_, _e.g._, Carriage of Goods by Sea Act, 46 U.S.C. § 30706(b)(2); the Oil Pollution Act, 33 U.S.C. § 2703(a)(1); the National Marine Sanctuaries Act, 16 U.S.C. § 1443(a)(3)(A); the Park System Resource Protection Act, 16 U.S.C. § 19jj-1(c)(1).

The Court's attention has not been drawn to any authority after the 1986 amendments in which Act of God has been applied in defense of a Wreck Act claim. Under today's Wreck Act, the owner of a wreck sunk in navigable waters has a clearly expressed duty, without regard to fault, both to mark and remove the wreck. Because fault is irrelevant to a Wreck Act claim, Southern Scrap cannot be excused from liability by an Act of God because the statute imposes strict liability; strict accountability. In fact, as the government points out, the Fifth Circuit and one commentator have suggested that Act of God is not available in defense of a statutory duty, such as marking or removing a wreck. See In re Marine Leasing Servs., 471 F.2d 255, 257 (5th Cir. 1973)(*per curiam*);[18] Nunley v. M/V DAUNTLESS COLOCOTRONIS, 863 F.2d 1190, 1197-1203 (5th cir. 1989)(finding breakaway of barge during storm

---

[18]In In re Marine Leasing Servs., a barge full of chlorine broke free during Hurricane Betsy and sank in the Mississippi River. 328 F. Supp. 589 (E.D. La. 1971). The United States searched for and marked the wreck, then raised the wreck when the owner abandoned it. The district court determined that Hurricane Betsy was an Act of God and found that it was the sole proximate cause of the sinking. Id. at 597. Since the pre-1986 Wreck Act permitted recovery of wreck removal expenses only from those who "voluntarily or carelessly sink" their vessels, the district court held that the United States could not recover its wreck removal costs from the non-negligent owner. Id. at 598-99. However, the district court reached a different conclusion regarding the United States' costs to locate and mark the wreck, finding such costs were recoverable because the owner had a duty to locate and mark the wreck regardless of fault. Id. The Fifth Circuit affirmed in a per curiam opinion, noting that the statute imposed a duty on the owner to mark a vessel even when it is 'accidentally' sunk. In re Marine Leasing Servs., 471 F.2d 255, 257 (5th Cir. 1973)(per curiam).

an "inevitable accident," and owner non-negligent, in denying liability for collisions, but awarding the United States its costs incurred in marking the wreck before it was abandoned because the strict liability duty to mark was not excused by inevitable accident); see also James E. Mercante, Hurricanes and Act of God: When the Best Defense is a Good Offense, 18 U.S.F. Mar. L.J. 1, 17-18 (2005-06)(noting that the Wreck Act "no longer relieves vessel owners of the duty to remove a wreck when caused by circumstances beyond their control such as a force majeure or act of God").

Finally, to accept Southern Scrap's argument would ignore and undermine the clear language of the Act and would shift responsibility for removing wrecks to the United States, contrary to the purpose of the Wreck Act. Indeed, if the Court simply accepted that Hurricane Katrina was an Act of God that caused thousands of vessels to escape their moorings and that such a defense could be raised in defense of post-Katrina wreck removal claims, then (accepting Southern Scrap's argument) the United States would be responsible for removing and funding the removal of all wrecks from navigable waterways anytime there was a hurricane.[19]

---

[19]During oral argument, counsel for Southern Scrap suggested that, if the Court could entertain Act of God as a defense to a wreck removal claim, the shift of the duty to the government would be limited, given that the party asserting the defense must prove that it took reasonable precautions. The Court, however, would still be called upon to determine the reasonableness of Southern Scrap's conduct, which the Wreck Act's strict liability standard forbids.

That is not the language or the purpose of the Wreck Act. Accordingly, the Court finds, as a matter of law, that Southern Scrap cannot raise Act of God in defense of the government's wreck removal claim.[20]

Southern Scrap further suggests that disputed issues of fact concerning its Act of God defense preclude summary judgment on liability.[21] Because the Court finds, as a matter of law, that Act

---

[20]The Court further points out the distinction between the cause of the wreck and the cause of the failure to commence removal operations. While it is certainly likely that any number of factors contributed to the drydock escaping its moorings (perhaps the force of the storm, some failures in securing it, and possibly some additional surge created by MRGO), the Wreck Act does not address what causes the wreck, but rather focuses on removal efforts assuming an obstruction in a navigable waterway.

A more speculative issue would be whether a wreck owner was prevented from removing a wreck because of an Act of God. (If Southern Scrap had been prevented from returning to the City or its access to the Industrial Canal was restricted and it was in this way prevented from removing the wreck, perhaps a different question would be presented. However, the government points out that, by the time wreck removal operations began, Southern Scrap had access but lacked the workers or equipment to carry out removal.)

[21]Even if Southern Scrap persuaded the Court that the Act of God defense was viable, human negligence as a contributing cause defeats any claim to Act of God immunity. Crescent City Towing & Salvage Co., Inc. v. M/V CHIOS BEAUTY, No. 05-4207, 2008 WL 3850481, at *14 (E.D. La. Aug. 14, 2008)(an Act of God will insulate a defendant from liability only if there is no contributing human negligence). Here, the government contends that Southern Scrap was negligent in mooring the drydock. (Southern Scrap also insists that the Corps' negligence was another contributing factor to the drydock breakaway, which likewise seems to dilute its Act of God defense.) Southern Scrap finally suggests that the thousands of other barges and vessels that escaped their moorings during Hurricane Katrina shows that no amount of reasonable care was sufficient to withstand the storm. Again, to accept Southern Scrap's argument would be to impermissibly shift a vessel owner's statutory duty onto the government, in disregard of

of God defense is unavailable in this wreck removal suit, the Court need not address whether Southern Scrap took adequate precautions to prevent the drydock from escaping.

2.     Government Fault

Southern Scrap next seeks to defend this wreck removal claim by pointing to the Corps' negligence with respect to the MRGO; negligence that created the massive storm surge, which caused the drydock to breakaway.[22]  Because the government caused the wreck, the argument goes, it should be responsible for the wreck removal expenses.

The government counters that, even if sole government fault is available as a defense to a Wreck Act claim, Southern Scrap cannot avail itself of the sole government fault defense because other credible and possible causes for which the government is not responsible may have contributed to the drydock's breakaway; only sole government fault could possibly be raised as a defense to a wreck removal claim.  The Court agrees.

To repeat, the Wreck Act is a liability without fault statute. In re Barnacle Marine Mgmt, Inc. 233 F.3d 865, 868 n.6 (5th Cir.

_____

the text of the Wreck Act.

[22]Southern Scrap says its coastal engineering expert has calculated that the MRGO increased the storm surge in the Industrial Canal by four feet and that this increased storm surge and wave action by MRGO caused the drydock to escape its moorings. This, says Southern Scrap, raises an additional disputed issue of fact that precludes summary judgment in the Corps' favor on liability.

2000). Thus, as the Fifth Circuit, without hesitation, has held in Southern Scrap I, "the United States can state a personal liability claim against Southern Scrap under the Wreck Act for the recovery of its actual cost of removing the drydock from the Industrial Canal without alleging that the vessel owner negligently caused the sinking." Southern Scrap, 541 F.3d at 595.

Because the United States' Wreck Act claim against Southern Scrap is one of strict liability, contributory negligence is not available as a defense. See United States v. Tug Colette Malloy, 507 F.2d 1019, 1022 (5th Cir. 1975)("Garden-variety contributory negligence is not ordinarily deemed a defense to strict liability, and we do not believe that such fault should be a defense in this strict-liability admiralty suit [under Section 408]."); see also Arkansas River Co. v. United States, 947 F. Supp. 941, (N.D. Miss. 1996)(noting that the only defense to a claim under the Rivers and Harbors Act is the "sole cause defense"); United States v. THE TUG REBEL, 893 F. Supp. 940, (D. Ore. 1995)("This court adopts the reasoning of [the Sixth Circuit in Chotin] and the holding of the Courts of Appeals in the Sixth, Seventh, and Eighth Circuits that preclude the application of general provisions of comparative negligence to this action under the Rivers and Harbors Act"). If, however, the government could be shown to be solely at fault in causing the accident, a defense based on the government's sole fault might be available. See id. ("[W]e have no doubt that if the

23

tug had shown the gateman to be solely at fault in causing the accident a defense would have been established"); United States v. Republic Marine, Inc., 829 F.2d 1399, 1406 (7th Cir. 1987)("We hold that section 412 [of the Rivers and Harbors Act] does not make a vessel liable for damage that occurs entirely due to the fault of the government.").

Southern Scrap has provided no support for its theory that it can escape liability for anything less than sole government fault. And Southern Scrap cannot credibly argue that the record supports its theory that the Corps' faulty design, construction, maintenance and operation of the MRGO was the sole cause of the drydock's breakaway or of its own failure to remove the wreck. Because other complex causes for which the government is not responsible may well have contributed to the drydock's breakaway,[23] Southern Scrap cannot avail itself of the sole government fault defense to the United State's Wreck Act claim. See Chotin Transp., Inc. v. United States, 819 F.2d 1342 (6th Cir. 1987)(In accordance with Rivers and Harbors Act, tug operator was strictly liable for damage to the

---

[23]Again, for the purposes of the Wreck Act, which imposes liability for wreck removal without regard to fault, the Court is not convinced that the relevant focus is on what caused the wreck; rather, the relevant inquiry as far as defenses are concerned, is what may have impeded the wreck owner from removing its wreck from navigable waters. Southern Scrap has not raised a genuine issue of material fact regarding whether the government was *solely* at fault for Southern Scrap's failure to remove its drydock, and the Court is precluded by the statute from allocating fault. Moreover, it is helpful to remind oneself that there were no witnesses to the event to establish a sole fault story.

lock, even though district court correctly found that lock operator was 50% at fault for causing damage).  Indeed, Southern Scrap has suggested, that Hurricane Katrina was an Act of God that was a contributing cause to the drydock's breakaway.

    3.   The Stafford Act

    The United States next contends that the Stafford Act is not available as a defense to its Wreck Act claim.  The Court agrees. The dispute about this is not particularly intense.

    On August 29, 2005, President George W. Bush declared a major disaster in Louisiana under the Stafford Act, 42 U.S.C. §§ 5121-5208, triggering implementation of federally-funded disaster relief programs.  The Stafford Act authorizes the Federal Emergency Management Agency to direct federal agencies to "provide assistance essential to meeting immediate threats to life and property resulting from a major disaster." Id. § 5170b(a).    The purpose of the Stafford act is "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damages which results from disasters."   Id. § 5121(b).  Among other forms of assistance, FEMA is authorized to direct agencies or to make grants to state or local governments to perform removal of debris from public and private land.   Id. § 5173.

    The Stafford Act contains a discretionary function exception,

which "preclude[s] judicial review of all disaster relief claims based upon the discretionary actions of federal employees." <u>St. Tammany Parish, ex rel. Davis v. Federal Emergency Management Agency</u>, 556 F.3d 307, 318 (5th Cir. 2009)(quoting <u>Rosas v. Brock</u>, 826 F.2d 1004, 1008 (11th Cir. 1987)).   Thus, the decision of whether and how much to commit Stafford Act funds is discretionary, and the provisions granting FEMA authority to fund debris removal from private property are cast in discretionary terms.   <u>See</u> <u>St. Tammany Parish</u>, 556 F.3d at 324 (noting that the Stafford Act contains a discretionary function exception to governmental liability that is nearly identical to the one contained in the Federal Tort Claims Act).   Federal regulations permit FEMA to provide assistance for removing eligible debris, "but they do not mandate assistance even where that eligibility criterion is met." <u>Id.</u> (citing 44 C.F.R. § 206.224(a)); <u>see also</u> <u>Sunrise Village Mobile Home Park v. Phillips & Jordan, Inc.</u>, 960 F. Supp. 283, 286 (S.D. Fla. 1996)("The authority [regarding debris removal under the Stafford Act] clearly leaves room for agency judgment on which property should be cleared, whether to include private property in the cleanup, and whether to use federal instrumentalities or to make grants to states, local governments or to private nonprofit facilities to effectuate cleanup.").

Accordingly, claims for Stafford Act funding of debris removal are barred by the discretionary function exception to the Stafford

Act, 42 U.S.C. § 5148. <u>See</u> <u>St. Tammany Parish</u>, 556 F.3d at 326 (dismissing Parish's claims for funding of dredging to remove sediment in canals deposited by Hurricane Katrina, because FEMA's decisions are protected by the discretionary function exception); <u>see also</u> <u>Sunrise Village</u>, 960 F. Supp. at 286-287 (claims challenging government's decisions of when, where, and how to remove debris after Hurricane Andrew were barred by the discretionary function exception). Southern Scrap's defense based on the Stafford Act is likewise barred.[24]

III.

The United States next asks the Court to dismiss, or to alternatively sever and stay, Southern Scrap's counterclaim. In its counterclaim, Southern Scrap asserts that the Corps' negligent design, construction, maintenance and operation of the MRGO

_____

[24]The Court points out that Southern Scrap has not shown that the Corps was authorized to use Stafford Act funds for the removal of the drydock. Indeed, the Act required the Corps to act pursuant to its own authority for the Wreck Act and pursue recovery of its expenses from the owner. 44 C.F.R. 206.42(a)(4)("the [Federal Coordinating Officer] shall ... make certain that all Federal agencies are carrying out their appropriate disaster assistance roles under their own legislative authorities and operational policies"). <u>See also</u> <u>Wyandotte v. United States</u>, 389 U.S. 191, 205 n.16 (1967)(noting that the Disaster Relief Act did not bar the United States from recovering wreck removal expenses pursuant to the Rivers and Harbors Act). This is consistent with the purpose of FEMA assistance, which is "intended to supplement assistance from other sources," not to serve as a primary source of insurance. <u>Plaquemines Parish School Board v. Industrial Risk Insurers</u>, No. 06-7213, 2009 WL 650366, at * (E.D. La. Mar. 11, 2009)(citing FEMA Disaster Assistance Policy 9525.3 (July 24, 2007)).

magnified Hurricane Katrina's storm surge in the Industrial Canal and caused the drydock to escape its moorings. By its counterclaim, Southern Scrap seeks to offset its liability to the Corps and others arising from the escape of the drydock, and also seeks to recover for damage to Southern Scrap's property, which it says was caused by the increased storm surge produced by the MRGO.

*A.*

The United States first seeks to dismiss Southern Scrap's counterclaim for lack of subject matter jurisdiction because the United States has not waived sovereign immunity. Southern Scrap counters that its counterclaim arises out of the same transaction or occurrence as the United States' Wreck Act claim, and thus the United States waived immunity for its compulsory counterclaim, and further that its counterclaim falls under the waiver of immunity statutorily granted by the Federal Tort Claims Act, which waives sovereign immunity for suits against the United States for tort damages.

1. Whether the Filing of the Wreck Act Claim Waives Immunity

"[A] defendant is either compelled by [Federal Rule of Civil Procedure] 13(a), or permitted by 13(b), to counterclaim against the sovereign within the limits to which the sovereign immunity has been given up by the United States." <u>Frederick v. United States</u>, 386 F.2d 481, 488 (5th Cir. 1967). The United States cannot be sued, however, unless it specifically consents to be sued, either

by statutory consent, or by instituting a suit to which a defendant may plead matters in recoupment. See <u>United States v. Shaw</u>, 309 U.S. 495 (1940); <u>Frederick</u>, 386 F.2d at 488. Rule 13(d) of the Federal Rules of Civil Procedure reaffirms the sovereign immunity principle by providing that it does not expand the right of a party to sue the United States. See Fed.R.Civ.P. 13(d)(providing "[t]hese rules do not expand the right to assert a counterclaim – or to claim a credit – against the United States...");[25] <u>see</u> <u>also</u> <u>Frederick</u>, 386 F.2d at 487 (considering the interplay between the doctrine of sovereign immunity and Rule 13 and observing that "[b]oth 13(a) and (b) are qualified by 13(d) in cases against the United States"). Before considering whether the government has statutorily consented to be sued, the Court first considers whether, when the United States sued Southern Scrap, it waived its immunity as to Southern Scrap's counterclaim; the question, therefore, is whether Southern Scrap's counterclaim sounds in recoupment such that it is compulsory.

In <u>Frederick</u>, the United States sued to recover an amount due from a guarantor of a note. <u>Frederick</u>, 386 F.2d at 483. The Fifth Circuit considered whether the guarantor of the note could bring a counterclaim against the United States based on alleged

_____

[25]Rule 13(a) governs compulsory counterclaims, requiring that a pleading state as a counterclaim any claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a)(1)(A). Rule 13(b) governs permissive counterclaims.

torts associated with the government's handling of the property securing the debt.  Id. at 487.  The Fifth Circuit held that the counterclaim arose from the same transaction or occurrence as the guaranty, but explained that there were limits on the defendant's ability to assert a counterclaim against the United States:

> Our conclusion is that when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment – arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim, but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount the government claims; but the sovereign does not waive immunity as to claims which do not meet the same transaction or occurrence test nor do claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff....  As defined in [Federal Rule of Civil Procedure] 13(c), a counterclaim may diminish or defeat the recovery sought by the opposite party – this is as far as the government's waiver goes.  It may also, but need not, 'claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party.'  The government does not go so far as to waive its immunity to this kind of claim.

Id. at 488 (internal citations omitted).  Thus, to be considered a claim for recoupment, as opposed to setoff, a counterclaim must arise from the same transaction or occurrence as the government's claim, must seek relief of the same form or nature as that sought by the government, and must not exceed the relief sought by the government.  See id. at 488 (citing cases and noting that "attempts by defendants to seek affirmative relief which was not to reduce or extinguish the government's recovery but to establish an

independent right to recovery from the government" were not considered claims for recoupment).[26]  These limitations have been upheld in various contexts.  <u>See</u> <u>E.E.O.C. v First National Bank of Jackson</u>, 614 F.2d 1004, 1008 (5th Cir. 1980)(counterclaim based on alleged malicious prosecution, which was brought in response to Title VII suit, was too tenuous and indirect to warrant the invocation of the doctrine of recoupment); <u>see</u> <u>also</u> <u>United States v. Towers</u>, No. 93-4260, 1994 WL 382610, at *4 (E.D. La. July 15, 1994)(dismissing counterclaim for tortious interference in property ownership for lack of subject matter jurisdiction, finding that it did not arise from the same transaction or occurrence as the government's Fair Housing Act violation claim, and counterclaim exceeded permissible amount of recoupment).

Specifically, Southern Scrap asserts that the design and construction of the MRGO was flawed, causing a funneling effect for storm-driven surges from the Gulf of Mexico, which significantly increased storm surge volume and force as it traveled through St. Bernard Parish and Orleans Parish to the Industrial Canal and Lake

---

[26]The Court must determine whether Southern Scrap's counterclaim sounds in recoupment or, rather, is for setoff. Recoupment is a demand asserted to diminish or extinguish the plaintiff's demand, whereas setoff arises out of a transaction extrinsic to the plaintiff's claim. <u>See</u> <u>Matter of Gober</u>, 100 F.3d 1195, 1207-08 (5th Cir. 1996); <u>Frederick</u>, 386 F.2d at 487-88 (citation omitted)(noting that "[t]he distinction between recoupment and set-off has significance where a defendant sued by the United States asserts a claim as to which the government has made no statutory waiver of its sovereign immunity").

Ponchartrain. The funneling effect of the MRGO, Southern Scrap contends, resulted in substantial forces being exerted against levees and spoil banks in Orleans and St. Bernard Parishes. Southern Scrap further contends that the Corps also failed to properly maintain the MRGO and failed to remove silt to the 36 foot project depth, which increased the funneling effect of the waterway into the Industrial Canal. According to Southern Scrap, the unprecedented storm surge created by Katrina and the Corps' defective design, construction, inspection, repair, and maintenance of the MRGO (and resulting loss of wetlands) struck Southern Scrap's property, severely damaging its facility and causing the drydock to escape its moorings and partially sink in the Industrial Canal near the Florida Avenue Bridge.[27]

The government insists that Southern Scrap's counterclaim fails all three elements of an action for recoupment because (1) the Wreck Act claim and the MRGO counterclaim did not arise from the same transaction or occurrence; (2) the counterclaim is of a different "form or nature" than that of the United States'; and (3)

---

[27]Southern Scrap maintains that the Corps' negligence caused Southern Scrap the following damages: destruction, damage and environmental contamination of its facility, contents, and drydock; decreased valuation of its property; cost of temporary and permanent repairs; loss of use of property; lost business income; recoupment of wreck removal expenses. Southern Scrap further asserts entitlement to recover indemnity or contribution from the Corps to the extent it is held liable in the limitation proceeding, C.A. No. 06-1860, in which vessels that allided with the sunken drydock have filed claims.

Southern Scrap's demand exceeds the United States' claim for wreck removal expenses. The Court agrees.

The United States filed its suit to recover its expenses incurred in removing Southern Scrap's drydock from navigable waters; the wreck removal took place during the last few months of 2005. Southern Scrap's counterclaim, on the other hand, is based on the design and construction of the MRG0, which occurred in the 1950s and 1960s, and the maintenance and repair of the MRGO, which occurred from the date of construction until the project was de-authorized in June 2008. The occurrence of the wreck and the damage to its facility, which Southern Scrap asserts was caused by Hurricane Katrina and the Corps' negligence, is separate and distinct from Southern Scrap's failure to remove the wreck.[28]

Moreover, the United States' Wreck Act claim is in the nature of restitution, while Southern Scrap's counterclaim is one arising out of tort. Indeed, Southern Scrap seeks to recover damage to its facility caused by the storm surge. In this regard, Southern Scrap seeks to recover from the government based on the government's negligence; this right to recover is independent of the government's statutory right to recover wreck removal costs, which arises from Southern Scrap's strict duty to remove its wreck from navigable waters. Also, the United States' claim arises under

_____

[28]Even the accrual times are different. The counterclaim accrued at the time of the storm, while the Wreck Act claim did not accrue until the wreck was removed and the contractor was paid.

admiralty jurisdiction, while Southern Scrap's claims for property damage to its facility do not. The nature of the issues and the evidence that will be necessary to prove the claims are also different: the United States must prove that the drydock was sunk in navigable waters; it was owned by Southern Scrap; Southern Scrap refused to remove the wreck; the United States removed the wreck; and the actual removal expenses were $9.3 million. On the other hand, Southern Scrap's case will focus on the Corps' design, construction, maintenance, and repair of the MRGO, and the impact these actions may have had on the storm surge at the drydock facility. Different evidence and expert witnesses will be used; there will be little evidentiary and legal theory overlap between the two cases.

Finally, Southern Scrap's demand for $27,217,603 in damages arising from its counterclaim far exceeds the United States' claimed $9,295,677 in wreck removal damages. See <u>United States v. United States Fidelity & Guar. Co.</u>, 309 U.S. 506 (1940)(a claim for recoupment may not exceed the principal amount claimed by the United States); <u>Frederick</u>, 386 F.2d at 488 (a counterclaim sounding in recoupment does not seek to recover more than the amount the government seeks to recover); <u>United States v. Livecchi</u>, 605 F. Supp. 2d 437, 450 (W.D. N.Y. 2009)(Recovery under a recoupment counterclaim may not exceed the principal amount claimed by the United States). Clearly Southern Scrap seeks affirmative relief

beyond reducing or extinguishing the government's recovery.

The Court finds that Southern Scrap's counterclaim does not arise from the same transaction or occurrence as the United States' Wreck Act claim, that it is not of the same kind and nature as the United States' claim, and that it exceeds the amount claimed by the United States. Accordingly, Southern Scrap's counterclaim is not a compulsory counterclaim for recoupment and, thus, the United States did not effect a limited waiver of sovereign immunity as to the counterclaim.[29]

2. Whether the FTCA Waiver of Immunity Applies

Southern Scrap contends that its counterclaim clearly arises under the law of negligence and, as such, its claim falls under the waiver of immunity statutorily granted by the Federal Tort Claims Act, 28 U.S.C. § 2671. The FTCA waives sovereign immunity for suits against the United States for damages:

> ...for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Southern Scrap argues that, because its counterclaim arises under the law of negligence, the sovereign

---

[29]The government contends that the Court should dismiss without prejudice Southern Scrap's separate and distinct counterclaims arising from the negligent construction and operation of the MRGO and resolve the United States Wreck Act claim.

immunity waiver of the FTCA applies.

Even so, the government answers, two exceptions to the statutory waiver of sovereign immunity shield the United States from FTCA liability: the due care exception and the discretionary function exception.  Section 2680(a) provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The "due care" exception, which is the first part of Section 2680(a), immunizes the Government from suit with respect to claims based on the execution of a statute or regulation and requires "for its application that the actor have exercised due care."  In re Katrina Canal Breaches Litig. (Robinson), 647 F. Supp. 2d 644, 701 (E.D. La. Nov. 18, 2009)(citing Lively v. United States, 870 F.2d 296, 297 (5th Cir. 1989).  The second part of the statute -- the "discretionary function" exception -- bars claims based on the performance of a government agency's or employee's discretionary function, regardless of whether that agency or employee abused its discretion.  Id. at 702 (citation omitted).

Southern Scrap relies on the Robinson court's finding that neither exception to the waiver of sovereign immunity applies to the claim regarding the Corps' negligent maintenance and operation of the MRGO navigational channel.  Robinson, 746 F. Supp. 2d at

701-17.  The government also relies on <u>Robinson</u> in urging this Court to dismiss Southern Scrap's claims that the United States negligently designed, engineered, constructed, and failed to dredge the MRGO because those claims challenge conduct that was both discretionary and subject to policy analysis.

Courts have routinely held that the Corps' decisions regarding constructing dikes or dredging rivers are protected by the discretionary function exception.  <u>See</u> <u>Robinson</u>, 627 F. Supp. 2d at 697; <u>Payne v. United States</u>, 730 F.2d 1434 (11th Cir. 1984)(Corps of Engineers' decision in dredging and widening river, causing erosion and collapse of plaintiff's house was protected by discretionary function exception); <u>Columbia Gulf Transmission Co. v. United States</u>, 966 F. Supp. 1453, 1465 (S.D. Miss. 1997)(Corps' decisions regarding whether, where, and how to build dikes and revetment along Mississippi River was protected by the discretionary function exception); <u>Vaizburd v. United States</u>, 90 F. Supp. 2d 210 (E.D. N.Y. 2000)(Corps' decisions regarding design and construction of storm damage reduction and shoreline protection project were protected by discretionary function exception); <u>Devito v. United States</u>, 12 F. Supp. 2d 269 (E.D. N.Y. 1998)(Corps' decisions as to proper method to combat hurricane damage and beach erosion, which allegedly accelerated shoreline erosion, were protected by discretionary function exception); <u>Canadian Pacific (Bermuda) Limited v. United States</u>, 534 F.2d 1165 (5th Cir.

1976)(finding "no duty imposed on the Corps...to survey or dredge the channel of the St. Johns River at any particular time or place[; t]o require such a duty would...make the Government the guarantor or insurer of the navigability at all times of the river, despite its ever-changing bed affected by tide, currents, erosion..."); <u>Kommanvittselskapet Harwi (Rolf Wigand) v. United States</u>, 305 F. Supp. 882, 890 (E.D. Pa. 1969)(government was not obliged to survey and dredge the Delaware River on a regular basis), <u>aff'd</u>, 467 F.2d 456 (3rd Cir. 1972); <u>In re Lloyd's Leasing, Ltd.</u>, 764 F. Supp. 1114, 1137 (S.D. Tex. 1990)("Determinations that the Corps made regarding frequency and location of maintenance dredging and surveying in the Bar Channel are, similarly, decisions based on policy considerations properly left to the direction of the Corps"); <u>Manns v. United States</u>, 945 F. Supp. 1349 (D. Or. 1996)(the discretionary function exception barred claims challenging the United States' decisions regarding dredging and inspection of the Columbia River); <u>Northlight Harbor LLC v. United States</u>, 561 F. Supp. 2d 517, 527 (D. N.J. 2008)(holding Corps' decisions in dredging that changed current in channel was protected by discretionary function exception).

As to repair and maintenance of the MRGO, the government points out that Judge Duval ruled favorably on this issue for some but not all plaintiffs; the court granted judgment for the plaintiffs located in the St. Bernard Polder, but denied recovery

to the Robinsons, located in the New Orleans East Polder. The government contends that Southern Scrap's facility is located next to the New Orleans Polder and the St. Bernard Polder, on the Industrial Canal and outside any flood control structures. The government adds that, because Southern Scrap claims that the MRGO funneled the storm surge to its facility, this theory should be rejected because the funneling effect is inherent in the design of the MRGO and, therefore, the government is shielded from any such claim by the discretionary function exception. Because severing and staying the counterclaims pending appeal in the Robinson matter is appropriate, the Court need not determine the applicability of the exceptions to the government's assertions of immunity at this time.

*B.*

Even if the Court does not dismiss Southern Scrap's counterclaims for lack of subject matter jurisdiction, the United States contends that the counterclaims should be severed and stayed pending resolution of the appeal in the Robinson case. The government points out quite accurately that the appellate decision in Robinson will resolve governmental immunity issues which will inform this Court's decision on those same issues.

Federal Rule of Civil Procedure 21 authorizes the Court to sever claims against a party. Fed.R.Civ.P. 21. Also, Rule 42 provides:

> For convenience, to avoid prejudice, or to expedite and
> economize, the court may order a separate trial of one or
> more separate issues, claims, cross-claims,
> counterclaims, or third-party claims. When ordering a
> separate trial, the court must preserve any federal right
> to a jury trial.

Fed.R.Civ.P. 42(b). The Court has broad discretion to sever issues to be tried. <u>Anderson v. Red River Waterway Comm'n</u>, 231 F.3d 211, 214 (5th Cir. 2000); <u>Xavier v. Belfor Group USA, Inc.</u>, Nos. 06-491 and 06-7804, 2008 WL 4862549, at *3 (E.D. La. Sept. 23, 2008). The Court may order severance when it determines that severance is "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition or economy." <u>F.D.I.C. v. Selaiden Builders, Inc.</u>, 973 F.2d 1249, 1253 (5th Cir. 1992). The following factors inform the Court's decision on severance: (1) whether the claims arose out of the same transaction or occurrence; (2) whether the claims present common questions of law or fact; (3) whether settlement or judicial economy would be promoted; (4) whether prejudice would be averted by severance; (5) whether different witnesses and documentary proof are required for separate claims. <u>Xavier</u>, 2008 WL 4862549, at *3. When a single claim is severed from a suit, it proceeds as a discrete, independent action, and the Court may render a final, appealable judgment in either one of the resulting two actions notwithstanding the continued existence of the unresolved claims in the other. <u>Allied Elevator, Inc. v. East Texas State Bank of Buna</u>, 965 F.2d 34, 36 (5th Cir. 1992).

The government relies on the same factors that support its motion to dismiss Southern Scrap's permissive counterclaims: the United States' Wreck Act claim and Southern Scrap's counterclaims do not arise out of the same transaction or occurrence and do not share relevant evidence, witnesses or legal theories. The Court agrees.

As the government points out, prejudice may be avoided by severing Southern Scrap's counterclaims because neither the United States nor Southern Scrap will have to incur the expense of presenting the factual and expert testimony necessary to determine the amount of storm surge experienced at the Southern Scrap facility, the cause of the storm surge, and what impact (if any) the maintenance or repair of the MRGO had on the storm surge.[30] The government insists that such proof may never be required if the appeals process in the <u>Robinson</u> case results in rulings that the United States did not waive sovereign immunity for claims based on Hurricane Katrina flooding (based on the Flood Control Act, the

---

[30]Indeed, as the government points out, Judge Duval stayed the trial of the MRGO Master Consolidated Class Action Complaint, explaining:

> It was and has always been the intention of this Court once the Robinson matter was adjudicated to stay all other proceedings considering the liability of the United States for the MRGO until the Court's decision would be made final through the appeals process. To do otherwise would undoubtedly result in an extreme waste of judicial resources, as well as those of the litigants.

FTCA due care exception, or the discretionary function exception), or that such flooding was not caused by any negligence on the part of the Corps. In sum, the United States' Wreck Act claim and Southern Scrap's negligence counterclaims are largely unrelated,[31] and Southern Scrap's counterclaim regarding the MRGO are closely related to the claims that have been made and are pending appeal in the <u>Robinson</u> case. Accordingly, severing and staying Southern Scrap's counterclaim is appropriate.

IV.

Finally, the United States seeks a ruling that it is entitled to recover all of its actual wreck removal costs (subject to proof at trial)[32] and further seeks to preclude Southern Scrap from introducing evidence supporting assertions that the United States' actual wreck removal costs are excessive or unreasonable. Southern Scrap contends that the United States' recovery of the costs incurred to remove Southern Scrap's wreck from the Industrial Canal should be limited to those removal costs that were reasonable.

The Wreck Act requires the owner, operator or lessee of a wreck sunk in navigable waters to remove the wreck. 33 U.S.C. §

---

[31]The Court notes that it has already determined, as a matter of law, that Southern Scrap cannot maintain as a defense to the Wreck Act claim its assertion of Corps negligence because it does not rely on *sole* government negligence to support its defense.

[32]The United States contends that, in support of its damages claim, it will show that the claimed costs were incurred as part of the drydock removal project, were billed to Boh Bros., and were paid.

409; 33 C.F.R. § 245.10 ("Primary responsibility for removal of wrecks or other obstructions lies with the owner, lessee, or operator"). The responsible party is required to prosecute such removal diligently and, if the responsible party fails to do so, then the United States is authorized to remove the wreck. <u>Id.</u>

The United States, through the Corps of Engineers, may remove wrecks pursuant to 33 U.S.C. § 414 (non-emergency removals) or 33 U.S.C. § 415 (emergency removals). The emergency wreck removal provision provides:

> (a) Removal authority
> Under emergency, in the case of any vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding, or being unnecessarily delayed in any Government canal or lock, or in any navigable waters mentioned in section 414 of this title, in such manner as to stop, seriously interfere with, or specially endanger navigation, in the opinion of the Secretary of the Army, or any agent of the United States to whom the Secretary may delegate proper authority, the Secretary of the Army or any such agent shall have the right to take immediate possession of such boat, vessel, or other water craft, or raft, so far as to remove or to destroy it and to clear immediately the canal, lock, or navigable waters aforesaid of the obstruction thereby caused....

33 U.S.C. 415(a). In emergency situations, the District Engineer may bypass the conditions for non-emergency removals if the wreck impedes or stops navigation, or poses an immediate threat to life, property, or a structure that facilitates navigation. 33 C.F.R. § 245.50(b).

Section 415 of the Wreck Act provides for recovery of "actual costs" when the government removes a wreck in an emergency:

> The owner, lessee, or operator of such vessel, boat, watercraft, raft, or other obstruction as described in this section shall be liable to the United States for the **actual** <u>**cost**</u>**, including administrative costs**, of removal or destruction and disposal as described which exceeds the costs recovered under subsection (a) of this section.

33 U.S.C. § 415(c)(emphasis added).  The regulations require the Corps to seek recovery for all removal and disposal costs in excess of the value of the recovered obstructing object.  33 C.F.R. § 245.60.

> Title 33 C.F.R. § 245.10(c) provides:

> (c) Emergency authority.  Obstructions which impede or stop navigation; or pose and immediate and significant threat to life, property, or a structure that facilitates navigation; may be removed by the Corps of Engineers under the emergency authority of section 20 of the Rivers and Harbors Act of 1899, as amended.

In 1986 and again in 1996, Congress amended the Wreck Act to increase what the Corps could recover from wreck owners who failed to remove their wrecks.  Originally, Sections 414 and 415 imposed only *in rem* liability for the government's removal costs, up to the value of the wrecked subject and its cargo.  In 1986, the law was amended to provide that owners, lessees, and operators of such obstructions sunk in navigable waters shall be liable to the United States for wreck removal costs that exceeded the value of the wreck.  Ten years later, Congress again amended Sections 414 and 415; in amending Section 415(b), Congress struck the word "cost" and expanded to "actual cost, including administrative costs." Water Resources Development Act of 1996, PL 104-303, 104th Cong.,

§ 218(b)(1996).  Thus, the Wreck Act now provides that the owner shall be liable to the United States for the actual cost of wreck removal, including administrative costs, 33 U.S.C. § 415(c).

No cases are directly on point.  The government invokes dicta in some cases to support its position that recovery of "actual cost" means recovery of the full amount it paid Boh Bros.  <u>See</u>, e.g., <u>In re Southern Scrap Material, L.L.C.</u>, 541 F.3d 584, 592 (5th Cir. 2008)(noting that, in addition to in rem liability, the responsible party shall also be liable to the United States for the actual cost of a wreck removal which exceeds the in rem value of the wreck; <u>Wyandotte Transp. Co. v. United States</u>, 389 U.S. 191 (1967)(noting that it would be surprising if Congress intended that the government's performance of Wyandotte's duty to remove the wreck must be at government expense); <u>University of Texas Medical Branch at Galveston v. United States</u>, 557 F.2d 438 (5th Cir. 1977)(the United States must be afforded complete relief against the parties responsible for the sinking).  While the amendments certainly suggest that Congress wanted to ensure that the Corps recovered its full expenses in removing wrecks, this gets the Court no closer to determining what role the Court might play in reviewing this component of a Wreck Act claim.  After all, "reasonableness" is not a stranger to tests for success in our professional culture.

Southern Scrap insists that the text "actual cost" must be

45

construed so as to avoid an absurd result. It would be absurd, Southern Scrap insists, for the Corps to be permitted to recover $90 million or somehow be permitted to run up (although the statute does not condone bad faith) wreck removal expenses without limit, knowing that the responsible party that had no control over the operation would be sent the bill. The issue, insists Southern Scrap, is, again, one of causation: excessive and unnecessary expenses are caused by something separate from actual wreck removal expenses: the Corps' failure to properly manage the wreck removal operation and implement appropriate cost control.

The government draws attention to cases involving environmental remediation statutes to support its contention that Congress seeks to ensure that the government can recover all of its costs paid. See United States v. Beatty, Inc., 401 F. Supp. 1040, 1045 (W.D. Ky. 1975)(rejecting defendants' argument that the United States' oil clean up costs were excessive because the Oil Pollution Act permitted the government to recover the actual costs incurred in cleaning up the pollution); Union Petroleum Corp. v. United States, 651 F.2d 734, 744 (Ct. Cl. 1981)(Under the Federal Water Pollution Control Act, the Coast Guard may recover all cleanup costs, even if those costs may be considered unreasonable); United States v. Northeastern Pharmaceutical & Chemical Co., Inc., 810 F.2d 726, 748 (8th Cir. 1986)(under CERCLA, all costs incurred by the government that are not inconsistent with the National

Contingency Plan are conclusively presumed to be reasonable; CERCLA does not refer to "all reasonable costs" but simply to "all costs"). What is central, submits the government, is not what by way of collateral issues was reasonable, but rather, what did the government actually pay as billed.

The government contends that under the circumstances, where the wreck removal was conducted in the immediate aftermath of Hurricane Katrina on an emergency basis, the Corps' decision that the wreck posed an obstacle that had to be promptly removed will be overturned only if it is arbitrary and capricious; the Corps looks to Agri-Trans Corp. v. Gladders Barge Line, Inc., 721 F.2d 1005, 1010 (5ᵗʰ Cir. 1983). The Corps also suggests, and the Court agrees, its decisions regarding payment of Boh Bros. invoices for wreck removal conducted under emergency circumstances should only be overturned if arbitrary and capricious. This is the proper, realistic and dependable standard; it affords judicial review of the wreck removal costs, while affording the Corps' decisions a level of circumstantial deference that takes into account the emergency conditions it, and its contractors, were operating under in the aftermath of an admitted disaster of rare history. See United States v. Hyundai Merchant Marine Co., Ltd., 172 F.3d 1187, 1190 (9ᵗʰ Cir. 1999)(rejecting claim that the United States could only recover reasonable or necessary oil spill response costs, and applying the Administrative Procedure Act's arbitrary and

capricious standard).

Here, the Corps contracted with Boh Bros., which in turn contracted with Bisso Marine, to remove the displaced drydock.[33] Boh Bros. ultimately invoiced, and the government paid, $9.3 million for the removal of the drydock. Southern Scrap contends this amount is "grossly excessive", that any liability imposed should be "reduced to the reasonable cost that should have been incurred in removing the drydock." The Corps counters that it should not be subjected to a financial penalty for wreck removal and that, based on the plain statutory language, cases interpreting the Wreck Act, the unimaginable circumstances wrought by Katrina, and the Fifth Circuit's first ruling in this case, Southern Scrap must pay the full $9.3 million and the Court cannot second-guess this "actual cost."

Because the Wreck Act provides for recovery of actual wreck removal expenses and imposes no encumbrance of a "reasonableness" requirement, the Court finds that it cannot second-guess whether the expenses incurred by the Corps were reasonable. But the Court can inquire into whether the sums expended were done so arbitrarily. Accordingly, the Court finds that the government can

---

[33]The Corps has not sought to recover any of its administrative costs; instead, the Corps' claim for costs is based solely on the costs charged by Boh Bros. Although not raised by either side, the Court can only wonder aloud whether "actual cost" must equate with "price paid" by the government? The Defense Agency Audit Report might be useful to such an inquiry.

recover its actual cost, but the actual cost paid must not be arbitrary.

Accordingly, IT IS ORDERED: that the United States' motion for summary judgment on liability is GRANTED; the United States' motion to dismiss or sever and stay Southern Scrap's counterclaim is DENIED insofar as it seeks dismissal, but GRANTED insofar as it seeks to sever and stay;[34] and the United States' motion for summary judgment and motion in limine as to actual wreck removal costs is GRANTED in part and DENIED in part as set forth and consistent with this Order & Reasons.

New Orleans, Louisiana, May 14, 2010.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[34]The severed part of this case will be closed administratively pending final resolution of Robinson on appeal.